673 P.2d 408

FUND FOR ANIMALS, INC., a New York corporation; Phillip D. Santee and Kathy Santee, husband and wife; Peter Nicholas and Claudia Nicholas, husband and wife; Barbara Martin-Sparrow, individually; Douglas Phillips and Marlene Phillips, husband and wife; Carole E. White-Leather, individually; and John W. Sackman, individually, Plaintiffs-Appellants,

v.

MUD LAKE FARMERS RABBIT COMMITTEE, an unincorporated association, its members, officers and organizers individually; Orvin Twitchell and Lane Eddins, individually and in their representative capacities; the Board of County Commissioners of Jefferson County; and Robert Hurley, Clyde Terry and Rex Furness, each individually and in his respective capacity as a Commissioner of Jefferson County, Idaho; and John Does 1 through 100, individually, Defendants-Respondents.

No. 14677.

Supreme Court of Idaho.

Dec. 8, 1983.

William L. Mauk and W. Craig James (argued), Boise, for plaintiffs-appellants.

Jerry R. Rigby and Ray W. Rigby, Rexburg, for defendant-respondent Mud Lake Farmers Rabbit Committee.

Robin Dwain Dunn and Stephen J. Clark (argued), Rigby, for defendant-respondent Jefferson County Commissioners.

Richard D. Petersen, Pocatello, and Richard L. Krause, Park Ridge, Illinois, for amicus curiae American Farm Bureau Federal and Idaho Farm Bureau Federation.

BISTLINE, Justice.

The trial court's Findings of Fact, unchallenged on the appeal, contain the factual background giving rise to the controversy:

"1. The area of Jefferson County called the 'Mud Lake area' has throughout the century been infested with jack rabbits. The rabbits visit the farms in the neighborhood and destroy the growing crops. In winter they attack the hay stacks. As the area has become more and more heavily farmed the damage done by rabbits has increased. Farmers have felt called upon to defend themselves. Several times over the years they have organized rabbit drives for the purpose of killing and destroying the rabbits. The drives are not held on an annual basis, but periodically, every five to ten years as the rabbit infestations tend to peak.

"2. 1981 was one of the years when the rabbit infestation reached a peak. Crops were destroyed in spring and summer months, and hay stacks were attacked in winter. Rabbits attack the bottom of the stacks eating their way into the center and leaving the stacks so that they shift and tip over.

"3. Rabbits are at their worst in the winter months when the snow is on the ground. When spring thaws come the rabbits withdraw into the desert. If drives were to be made on rabbits the best time to do so is in the winter when the weather is cold and the ground is snow covered.

"4. In the early winter of 1981 farmers discussed their problem with the county commissioners. The commissioners brought the matter up in their meeting and determined by unanimous vote that jack rabbits were an agricultural pest in that area of Jefferson County. The minutes of the meeting show that determination.

"5. The minutes do not show but the evidence does that the commissioners discussed various methods of erradicating rabbits. A rabbit drive was felt to be the most available and economical method and was authorized. Though they did not formally organize such a drive they did authorize its organization by farmers in the area.

"6. Though this drive was carried out in a manner quite similar to other drives it seems to have incurred an unusual amount of publicity. Newspapers, magazines and radios within our local area and outside our state carried accounts of the drive.

"7. Fund for Animals, an organization incorporated to help animals that were being abused, became interested and sent representatives to inspect the operation. Reports of their representatives aroused the corporation to action and they filed this suit seeking an injunction against the operation.

"8. The operation of the drive was under the supervision of various farmers who had property in the area where the rabbit infestation occurred. There was no formal organization. Dates for a drive were announced locally and anyone interested was invited to participate.

"9. At the field of operations the drivers arranged themselves behind the rabbits and with the use of clubs drove them toward a fence and a pit that had been dug there. Then by hitting them on the head with their clubs the rabbits were killed and piled in the pit.

"10. Baseball bats, golf clubs, tire irons, and sticks of wood were used as clubs. Some rabbits were hit and thrown into the stack of dead rabbits, but were not dead. Some children under the age of 16 years participated in the drive. They were not able to kill the rabbits but did maim and mutilate them. Some people tended to make a sport of the event and tossed rabbits to others who swung their clubs at them.

"11. A sheriff's deputy was present at all drives. He was told to keep the proceedings under control. He was also told that there was no law prohibiting the killing of the rabbits and no law defining what type of person might participate. He was told to prevent acts of unusual cruelty but was left to his own initiative to determine what acts fell in that category. Though he did note some of the acts described in Finding No. 10, he felt that on the whole the drive was quite orderly.

"12. The court has found that the acts described in Finding No. 10 did happen during the drive. He now finds that such acts were not numerous. Most of the drivers took the operation seriously and tried to avoid unnecessary roughness. The leaders did attempt to discourage acts of unnecessary cruelty and did caution against treating the drive as a game or sport.

"13. It is impossible to conduct drives such as these without many animals being killed, some animals being mutilated and some animals experiencing pain and suffering without the relief of death. To a degree pain and suffering and mutila-

tion are necessary to the accomplishment of the purpose for which the drive was organized.

"14. Though the law authorizes the erradication of pests it does not prescribe the manner in which it should be done.

"15. Rabbits might be controlled by poison but this method might result in destruction of other animals and in so tainting vegetation that it could not be used. They might be controlled by an electric contraption into which they are driven and which produces instant death without pain, but this contraption is not presently on the market and is untested. It would be expensive and would still require a drive with many of the undesirable incidents that ordinarily accompany it. They might be controlled by erection of fences around hay stacks but putting such fences around all the stacks in the area so constructed as to hold the rabbits out would incur a greater expense than the average farmer, whose expenses are already pushed quite high by inflation and whose crops do not produce high income, could afford.

"16. The above and other alternate methods were considered by the commissioners before endorsing the drive. They arrived at the conclusion that the most practical and economical method was the one endorsed. They were authorized by law to reach such a decision and I cannot find that they abused their discretion."

R., pp. 128–32.

The court's Conclusions of Law—which are not challenged by the respondents with a cross-appeal, and which we do not see as challenged by the appellants, are as follows:

"1. Regulation of cruelty to animals was not provided by the common law....

"2. Statutes in the State of Idaho make it unlawful to mutilate, maim or kill animals in a cruel or brutal manner. Other statutes condemn abuse of animals as a sport or game.

"From these statutes comes the conviction that cruel and abusive treatment of animals unnecessarily done or done for sport and amusement is against the public policy of our state and is unlawful.

"3. When animals threaten the physical or financial survival of man, he is lawfully entitled to strike back and to use such tactics as appear necessary and reasonable for the accomplishment of that purpose.

"4. When jack rabbits become so numerous that their activities threaten the economy of a community, destroy the farmers' crops and threaten to destroy his stacks of hay on sale of which he relies for a livelihood, the community is justified in taking actions to erradicate them.

"5. When no form of action is prescribed for them by law the community may, after reasonable consideration, take whatever action appears to them to be most necessary and reasonably available for the accomplishment of their purpose.

"6. If county commissioners given legal authority to do so, and permitted by law to exercise reasonable discretion, authorize a rabbit drive this court cannot enjoin the operation of the drive unless they are shown to have abused their discretion.

"7. Killing, maiming to some extent, mutilating to some extent, causing of pain and suffering to rabbits are necessary incidents to a rabbit drive operated for their destruction. It cannot be enjoined if it is reasonably necessary to the accomplishment of their purpose."

R., pp. 132–33.

The judgment of the court based on the foregoing Findings of Fact and Conclusions of Law was in the form of mandatory injunction relief directed to the named defendants-respondents:

"It is therefore hereby ordered:

"1. That children under the age of 16 years be forbidden to enter the kill area or to participate in the killing of rabbits, and that children under the age of 12 years be forbidden to participate in the drive.

"2. That during the drives all persons are prohibited from engaging in the game of 'Bunny baseball,' or any other

activity that tends to make of the drive a game or sport rather than a serious effort to accomplish a necessarily brutal but authorized purpose.

"3. Deputies from the sheriff's office must attend each and every drive conducted under authority hereof and must to the extent that they are reasonably able, enforce orders 1 and 2 above." R., p. 133.

At oral argument counsel for the appellants, when asked if the trial court had granted all of the relief sought, answered "yes." Although all counsel suggested ambiguities in the trial court's Conclusions of Law, and Judgment based thereon, we see none. The judgment of the trial court fully disposed of the issues which were presented and in our view provided the defendants-respondents Committee and Commissioners with adequate guidance should the same circumstances again arise in the future.

Judgment affirmed. Costs to respondents. Each party to bear its own attorney's fees.

DONALDSON, C.J., and SHEPARD, BAKES and HUNTLEY, JJ., concur.